38 N.J. Super. 35 (1955)
118 A.2d 93
FRANK T. KENNEDY, ET AL., PLAINTIFFS-RESPONDENTS,
v.
ALFRED J. MOCKLER, ET AL., DEFENDANTS-APPELLANTS AND CROSS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued September 27, 1955.
Decided November 4, 1955.
*37 Before Judges GOLDMANN, FREUND and CONFORD.
*38 Mr. Robert Carey, Jr., argued the cause for defendants-appellants and cross-respondents Telford, DeFilippo, Gallo, Guth, Conroy and the estate of Belle Saul (Messrs. Carey, Schenk & Jardine, attorneys for defendant-appellant and cross-respondent Telford; Messrs. Stryker, Tams & Horner, attorneys for defendants-appellants and cross-respondents DeFilippo and Gallo (Mr. James E.M. Tams, of counsel); Messrs. Albinson & Welle, attorneys for defendants-appellants and cross-respondents Guth, Conroy and the estate of Belle Saul (Mr. George Welle, of counsel)).
Mr. A. Leo Bohl appeared for defendant-respondent Alfred J. Mockler.
Mr. Marshall Crowley argued the cause for defendants-respondents Annie Mockler and Marguerite Connolly (Messrs. Toner, Crowley, Woelper & Vanderbilt, attorneys).
Mr. Edward L. Duggan argued the cause for plaintiffs-respondents and cross-appellants Kennedy and First National Bank of Montclair, executors under the will and codicil of Denis James Mockler.
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Defendants Kathleen Telford, Dorothy Pennington DeFilippo, Kathleen Gallo, Dorothy Guth, Agnes Conroy and the estate of Belle Saul appeal from a judgment of the Chancery Division directing a distribution of the residuary estate of Denis James Mockler, deceased, among all of the 14 legatees named in paragraphs Seventh through Twentieth of his will in proportion to the amount of their bequests as set forth in those paragraphs, notwithstanding the revocation of four of the bequests by specific provisions contained in a codicil to that will.
By their amended complaint plaintiffs, as executors of the will and codicil of Denis James Mockler, sought the instructions of the court as to the distribution of testator's residuary estate. Mockler died March 5, 1951, leaving a last will *39 dated October 8, 1948 and a codicil dated August 10, 1949. The will and codicil were probated, the estate administered, and taxes and administration expenses have been paid, as have general legacies. Mockler left an estate valued at approximately $435,000, consisting largely of securities. The account of the executors has been approved and their commission paid. The residuary estate amounts to approximately $240,000.

I.
By his will decedent, after providing for payment of debts and funeral and testamentary expenses, first made certain religious and charitable bequests totalling $4,000. He then made cash bequests totalling $88,000, as follows:

Par. Seventh Alfred Mockler, brother $20,000
Par. Eighth Annie Mockler, sister 15,000
Par. Ninth Kathleen Telford, sister 5,000
Par. Tenth Louise Kennedy, sister 5,000
Par. Eleventh Christina Harding, sister 5,000
Par. Twelfth Belle Saul, sister 2,500
Par. Thirteenth Marguerite Connolly, niece 2,500
 (daughter of deceased sister)
Par. Fourteenth Nora Farrell, niece 5,000
 (daughter of Louise Kennedy, sister)
Par. Fifteenth Agnes Conroy, niece 500
 (daughter of Belle Saul, sister)
Par. Sixteenth Dorothy Guth, niece 500
 (daughter of Belle Saul, sister)
Par. Seventeenth Frank Kennedy, nephew 15,000
 (son of Louise Kennedy, sister)
Par. Eighteenth Alfred Harding, nephew 2,000
 (son of Christina Harding, sister)
Par. Nineteenth Dorothy Pennington (friend) 5,000
Par. Twentieth Kathleen Gallo (friend) 5,000
 _______
 Total $88,000

By paragraph Twenty-first he disposed of his residuary estate in the following manner:
"I direct that all the rest, residue and remainder of my estate, of whatsoever it may consist and wheresoever situated, whether *40 real, personal, or mixed, be converted into money and I give and bequeath to each beneficiary under Paragraphs 7 to 20 inclusive of this my Last Will and Testament, an amount of money that is in the same proportion to the total amount of my residuary estate as the amount of money which that beneficiary receives under any paragraph of the said Paragraphs 7 to 20 inclusive is to the total amount, not including the amount that is paid over to become a part of my residuary estate, that is paid over to the said beneficiaries under the said Paragraphs 7 to 20 inclusive of this my Last Will and Testament."
In each instance in which he had given a legacy in paragraphs Seventh to Twentieth the testator anticipated the possibility that the legatee might predecease him. He accordingly made provision for alternate disposition in such event, either to the children, sisters or parents of such legatee, or to his residuary estate. Each primary legatee named in those paragraphs in fact survived him. His sister Belle Saul, who received $2,500 under paragraph Twelfth, died subsequent to testator, and her executors (her daughters Mrs. Conroy and Mrs. Guth), each of whom received $500 under paragraphs Fifteenth and Sixteenth, have been substituted as parties in her stead.
Testator nominated plaintiffs Frank Kennedy, his nephew, and the First National Bank and Trust Company of Montclair, executors of his will.
On August 10, 1949 testator executed a codicil. After first referring to the will he stated, "I now desire to make certain changes therein and additions thereto," and "do make, publish and declare this my Codicile [sic] to my Last Will and Testament in the following manner: * * *." In paragraphs First, Third, Fifth and Seventh of the codicil he stated, "I hereby revoke" the Seventh, Eighth, Thirteenth and Seventeenth clauses, respectively, "of my Last Will and Testament in its entirety, wherein I made a bequest to" his brother Alfred Mockler, his sister Annie Mockler, his niece Marguerite Connolly, and his nephew Frank Kennedy, respectively. By paragraphs Second, Fourth, Sixth and Eighth of the codicil he made bequests to each of these four relatives, as follows:
*41 (1) In the case of his brother Alfred Mockler (paragraph Second) he provided  as compared with the $20,000 bequest under the will  for a trust fund of $30,000 to be administered by Frank Kennedy and the First National Bank and Trust Company of Montclair as trustees, from which fund Alfred was to receive $1,200 a year in equal monthly installments, the trustees being authorized to invade the principal to meet the payments, if necessary. On Alfred's death the remainder was to go to testator's sisters who should survive testator, per stirpes; and if Alfred predeceased or died simultaneously with testator, the principal was to go in the same manner.
(2) In the case of his sister Annie Mockler (paragraph Fourth) he provided for a bequest of $10,000, as compared with the $15,000 bequest under the will, and further directed that in the event of her death prior to or simultaneously with his the $10,000 was to "be paid over to and become part of my residuary estate under my Last Will and Testament."
(3) In the case of his niece Marguerite Connolly (paragraph Sixth) he provided for a bequest of $100, as compared with the $2,500 bequest under the will, and directed that in the event of her death prior to or simultaneously with his, the $100 was to "be paid over to and become part of my residuary estate under my Last Will and Testament."
(4) Finally, in the case of his nephew Frank Kennedy (paragraph Eighth) he provided for a bequest of $10,000, as compared with the $15,000 legacy under the will, and directed that in the event of his nephew's death prior to or simultaneously with his, the $10,000 should go to Kennedy's daughter, and if the latter should predecease or die simultaneously with the testator the bequest was to "be paid over to and become part of my residuary estate under my Last Will and Testament."
The effect of the changes made by the codicil in the bequests of the named beneficiaries was to reduce the total bequests, other than the $4,000 given to religious and charitable institutions, from $88,000 to $85,600.

*42 II.
Something should be said concerning the circumstances surrounding the execution of the will and the codicil. Sometime prior to executing his will testator on several occasions spoke to his nephew Frank Kennedy, subsequently named as one of his executors, and asked his advice with reference to the will. Kennedy advised him to see a lawyer; "Decide on what you want to give to these people, use that as a pattern, give X amount so much money, Y amount so much money, and then whatever you have left over proportion it. It would be proportionate on what you in your own way decide on who you wanted to give the money to and how much." Testator also stated specifically that "Naturally, I want to take care of Nan"  his sister, Annie Mockler. Shortly before making his will testator also spoke with one McHugh, vice-president of the First National Bank and Trust Company of Montclair, about the will. McHugh suggested that he see a lawyer, but he refused. Testator gave McHugh the information with reference to his will, and McHugh forwarded it to an attorney who then proceeded to draw the will and sent it to McHugh. He in turn mailed it to testator at Port Chester, N.Y., where testator executed it.
Just prior to the execution of the codicil on August 10, 1949 testator again spoke with his nephew Kennedy. He said he wanted to make some changes in the will, and that in the case of his brother, Alfred Mockler, he "would like to make it income only" to go to him. Kennedy told him it would be easy to do so; all he had to do was to decide on the amount of income he wanted Alfred to have and capitalize that sum. Thereafter testator went to see McHugh, bringing with him a paper which he said was a codicil and which he asked to have witnessed. He said he had been thinking about the bequest to his brother Alfred and had decided that Alfred would be better protected by an income type of bequest than a flat sum. They then discussed the amount that was named in the original will, and the figure that later appeared in the codicil, $30,000. He further told McHugh *43 he wanted to make two or three other changes in the will, but didn't discuss them. McHugh suggested, and testator agreed, that the paper testator had brought with him be sent to the office of the attorney who had drawn the will. This was done, the codicil was prepared and sent to McHugh, and testator then came into the bank and executed it on August 10, 1949. Testator was in a "very great hurry" to execute the codicil as he was leaving for Europe in a few days.
Testator had discussed neither the will nor the codicil with the lawyers who drafted them. He died in Europe in March 1951.
The paper which testator had brought to McHugh and which contained instructions as to changes he wanted made in his will, was offered in evidence by counsel for the executors. The offer was objected to and the court sustained the objection. Subsequent to the hearing, the trial judge wrote counsel advising that he had reconsidered his ruling and admitted the paper as a possible help in resolving the ambiguity arising from reading the will and codicil together. However, in his written opinion he stated that the paper when examined "was not at all helpful since it added nothing to what was already set forth in the codicil itself and the court has reached its conclusion unaided by this exhibit." The paper purports to be a codicil to the original will. In it testator said: "I wish to make the following changes in that will," and then proceeded to mention them: (1) his brother Alfred was to have $30,000, to be invested by the executors so as to enable them to pay him $100 a month as long as he lived; if he predeceased testator the money was to be returned to the estate and divided pro rata among testator's surviving sisters; (2) his sister Annie Mockler was to receive $10,000, and if she died before testator the money was to be returned to the estate; (3) his niece Marguerite Connolly was to receive $100 "as she * * * is otherwise taken care of"; and (4) his nephew Frank Kennedy was to receive $10,000; if he did not survive testator, the money was to go to Frank's daughter Corrine on her twentieth *44 birthday, and if she did not survive testator, the money was to be returned to the estate.

III.
We should also mention such testimony as throws light upon the natural and special objects of testator's bounty. At the trial it was established that testator's unmarried and youngest sister, Annie Mockler, customarily known as Nan, had been stricken with polio in 1915. Before that she had supported herself with some assistance from testator. Following the attack it was three or four years before she could do anything for herself. During her illness she received financial assistance from testator and her other brother, Alfred Mockler, since she had no independent means of her own. After her recovery she worked in a New York dress shop for five or six years, but had to stop because the work was too hard on her. She took an apartment in New York and rented out rooms, supporting herself in that manner with the assistance of checks which testator sent her on occasion.
In 1941 she underwent two operations and could do nothing for about a year. During that time she lived with her niece Marguerite Connolly. In 1941 she resumed renting out rooms in an apartment and continued to do so until 1945. During this period testator came to visit and to see if she was all right, and sent her checks from time to time for $50, $100 and sometimes $200. In 1945 she gave up the apartment and went to live with Mrs. Connolly and her husband; she had no independent income of her own. In 1947 testator also came to live with the Connollys. He gave Annie $100 a month and sometimes more, keeping up these payments until a few months before he died in Europe in 1951. Some of the letters testator sent her and which she happened to save were admitted in evidence. They corroborated her testimony about the checks she received from decedent. Thus, on December 20, 1947 he wrote her from Pinehurst, N.C.: "Am sending your Jan. cheque now as you might want to use it"; on March 4, 1948 he sent her $100, and on March 31, 1948 $105 from Pinehurst, "the extra $5 being to pay for *45 my trunk"; on October 27, 1949 he sent a check for $280 (£ 100) from Surrey, England, as a gift from her brother Alfred Mockler; on May 25, 1950 he sent $100 from the same place, where he was then staying; and on October 10, 1950, when he was ill, he sent her $140 "for my allowance I give for your polio from which you have for 40 years."
In 1948 or 1949, before leaving for Europe, testator took Annie with him on a two-month trip to Albuquerque, New Mexico, at his expense. In his income tax return for 1947, 1948 and 1949  a period which runs from before the execution of the will to after the execution of the codicil  he listed her as his sole dependent, thus indicating that she was a relative with less than $500 income, who received more than half her support from testator.
The record shows that Alfred Mockler, testator's only brother, was on friendly terms with testator until the latter died. Testator stayed with him when he went to Europe immediately after executing the codicil. By his will testator gave him the largest share in the residue. Decedent evidenced his concern for Alfred in conversations with Kennedy and McHugh prior to the execution of the codicil.
Marguerite Connolly was the only daughter of testator's deceased sister. She had given Annie Mockler a home when she had no means of her own, and testator had gone to live with her in 1947.
Under the will, nephew Frank Kennedy received a share equal to Annie's. It was to him that testator had turned for advice in connection with the will and the codicil, and it was he whom testator chose as the individual executor of his will.
Alfred Mockler, Annie Mockler, Marguerite Connolly and Frank Kennedy were undoubtedly the natural objects of testator's bounty, Annie having been the particular object of his bounty and affection during his lifetime.

IV.
The parties advance three different sets of contentions as to the interpretation which should be given the will:
*46 1. Kathleen Telford, Dorothy Pennington DeFilippo, Kathleen Gallo, and Agnes Conroy and Dorothy Guth, the latter two both individually and as executrices of the estate of their mother Belle Saul, contend that the effect of the codicil is completely to eliminate Alfred Mockler, Annie Mockler, Marguerite Connolly and Frank Kennedy from any share in the residuary estate. It may here be recalled that Mrs. Telford, a sister, received less by way of particular legacy than the brother, sister and nephew of testator whom she would read out of a share in the residue, and the same is true of Mrs. Saul, another sister, whose estate makes a like claim; that Mrs. Conroy and Mrs. Guth, the daughters of Mrs. Saul, who press the same claim individually and as executrices of their mother's estate, received only $500 each as particular legatees; and that the remaining two who seek the same result, Dorothy Pennington DeFilippo and Kathleen Gallo, are not related to testator.
2. Defendants Alfred Mockler, Annie Mockler and Marguerite Connolly contend that the legacies under paragraphs Seventh through Twentieth of the will govern the determination of the shares of the respective legatees in the residuary estate, and that the only effect of the codicil is to change the amount of their particular legacies. Alternatively, they argue that if these paragraphs do not control the distribution, the legacies given by the codicil govern, and the amounts of the legacies as changed by the codicil are to be read into the will as substitutionary legacies for the purpose of distribution. Additionally, Alfred contends that if this alternative construction is proper, his share in the residue is to be computed on the basis of $30,000, the principal of the trust fund, being used to determine his share of the residue.
The primary contention of these defendants was upheld by the trial court.
3. The plaintiffs-executors  the bank and Frank Kennedy, one of the four persons whose particular legacy was changed by the codicil  agree with the primary contention of Alfred Mockler, Annie Mockler and Marguerite Connolly, *47 except that they argue that Alfred's share of the residue should be placed in trust by the executors for the purpose of paying him $1,200 a year for life, and on his death the principal distributed equally among the sisters who survived him.
Calculated on the basis of a $240,000 residuary estate, the following demonstrates how that estate would be distributed under each of the contentions advanced:

 Approx.Amt.
 Approx. Approx. Rec'd Under
 Amt. Rec'd. Amt. Rec'd. Contention
 Under Under of Appellants
 Judgment Executors' Telford,
 Below Contentions et al.
-----------------------------------------------------------------------
Alfred J. Mockler .......... $54,544 [*] None
Annie Mockler .............. 40,908 $40,908 None
Kathleen Telford ........... 13,636 13,636 $33,817
Louise Kennedy ............. 13,636 13,636 33,817
Christina Harding .......... 13,636 13,636 33,817
Belle Saul ................. 6,818 6,818 16,908
Marguerite Connolly ........ 6,818 6,818 None
Nora Farrell ............... 13,636 13,636 33,817
Agnes Conroy ............... 1,363 1,363 3,382
Dorothy Guth ............... 1,363 1,363 3,382
Frank Kennedy .............. 40,908 40,908 None
Alfred Harding ............. 5,454 5,454 13,526
Dorothy Pennington DeFilippo 13,636 13,636 33,817
Kathleen Gallo ............. 13,636 13,636 33,817

Testator's other two sisters, Louise Kennedy and Christina Harding, his niece Nora Farrell, and his nephew Alfred Harding, did not contest the matter in the trial court and apparently are satisfied with the judgment.

V.
The trial court held that testator in his codicil was concerned only with changing the specific bequests he had made *48 to the four legatees in question; that the codicil reveals no intention to alter or revoke the provision of the will controlling distribution of the residue; and that testator considered the residuary clause as entirely separate and distinct from the individual legacies in the preceding paragraphs and had no intention of affecting the carefully planned and express disposition of the residue. It concluded that the codicillary provisions did not affect the residuary bequests to the four legatees whose particular legacies were changed by the codicil, and therefore decided that distribution of the residuary estate under paragraph Twenty-first of the will was to be governed by the amounts of the legacies under paragraphs Seventh to Twentieth. An accordant judgment was thereupon entered.
Appellants Telford, DeFilippo, Gallo, Conroy, Guth and the estate of Belle Saul appeal from this judgment. Plaintiffs-executors cross-appeal, maintaining that Alfred Mockler's share, computed on the basis of the bequest of $20,000 under the will, ought to be placed in trust by the executors for the purpose of paying Mockler $1,200 a year for life, the principal thereafter to be divided equally among such of the sisters of testator as survive him.

VI.
The resolution of the problem posed by the appeal calls into play long-established canons of testamentary construction. In construing a will the purpose is always to ascertain the intention of the testator. To this end, the will and codicil in question must be read together. Struble v. Van Blarcom, 130 N.J. Eq. 467 (Ch. 1941). A codicil is, of course, regarded as a republication of the will, as modified by the codicil itself. In re Diament's Estate, 88 N.J. Eq. 552 (E. & A. 1918). A court may not, under the guise of construing a will, rewrite it; the intention must be found within its four corners, read in relation to the surrounding circumstances and the canons in aid of interpretation. The terms of the testamentary disposition may be elucidated, but not varied, enlarged, or contradicted by *49 extrinsic evidence. In re Armour's Estate, 11 N.J. 257, 278-279 (1953). In that case it was said: "The testatorial intention is that which finds expression in the will itself, read and evaluated in relation to the attendant circumstances."
Appellants complain that the trial court erroneously admitted extrinsic evidence, namely the testimony of Kennedy, McHugh and Annie Mockler, and the paper writing which testator brought to McHugh prior to executing his codicil. The general rule relating to the admissibility of extrinsic evidence in will construction cases is that evidence of the circumstances surrounding the testator and known to him at the time of the execution of the will  such as, for example, the nature and extent of the testator's property, the natural objects of his bounty, and his contemplated beneficiaries  are adducible to place the court in the situation of the testator in order to shed light on the meaning of the words of the will. In re Armour's Estate, supra (11 N.J., at pages 278-279); In re Fox's Estate, 4 N.J. 587, 593-594 (1950); Fidelity Union Trust Co. v. Noll, 125 N.J. Eq. 106, 107 (Ch. 1939); Noice v. Schnell, 101 N.J. Eq. 252, 272 (E. & A. 1927); Griscom v. Evens, 40 N.J.L. 402 (Sup. Ct. 1878), affirmed 42 N.J.L. 579 (E. & A. 1880); and see generally 5 New Jersey Practice (Clapp, Wills and Administration), §§ 108, 109, pp. 247, 257. The testimony of the witnesses was properly admitted. It is not necessary to pass upon the question as to whether the paper writing was admissible (in this regard, see In re Armour's Estate, supra (11 N.J., at page 279 et seq.), and cases cited; cf. Peckham v. Peckham, 97 N.J. Eq. 174, 176 (Ch. 1925)), since the trial court did not consider it in reaching its conclusions.
The plain language of the will and codicil, either standing alone or when read in the light of the settled canons of construction, leads us to the conclusion that the codicil does not and was not intended to revoke the residuary bequests to the four legatees whose particular legacies were changed, and that the distribution of the residuary estate *50 under paragraph Twenty-first of the will is governed by the amounts of the legacies under paragraphs Seventh through Twentieth. Nowhere in the codicil did testator state that he revoked or annulled the residuary bequests to the four legatees in question. The absence of such a provision is of significance, for had decedent intended to do so, he could and would have said so. Struble v. Van Blarcom, 130 N.J. Eq. 467, 469 (Ch. 1941). If that had been his intention, then, in the language of Lyon v. Clawson, 56 N.J. Eq. 642, 648 (Ch. 1898), affirmed o.b. 58 N.J. Eq. 584 (E. & A. 1899), "it is inexplicable why he did not do so in express words."
In his codicil testator, after referring to the will, stated, "I now desire to make certain changes therein and additions thereto." The only changes and additions he made in the codicil related to the particular legacies under paragraphs Seventh, Eighth, Thirteenth and Seventeenth of the will. These were his only apparent concern; he specifically limited the changes he desired to make. As the trial court pointed out in its opinion, on each occasion when testator revoked the legacy to the respective four legatees he said: "I hereby revoke the * * * Clause of my Last Will and Testament in its entirety, wherein I made a bequest to my * * *." (Italics by the court) The court then posed the rhetorical question whether this did not indicate that the preceding words of revocation were limited to the particular bequests and not intended to extend to the operation of the residuary clause. The answer must be in the affirmative.
The revocation was limited to the particular legacies and cannot be expanded as appellants contend. There is no justification for the court rewriting the codicil so as to effect additional changes that would revoke the residuary clause of the will as to certain beneficiaries for the benefit of others. Before the court is justified in determining that any provision of a will is altered or revoked by a codicil, it must be quite clear that such was the testator's intention. Thomas v. Scheible, 91 N.J. Eq. 451, 457 (Ch. 1920).
*51 It should also be noted that in paragraph Fourth of the codicil and again in paragraphs Sixth and Eighth, testator provided that the legacies thereunder should, in the event of the prior or simultaneous death of the legatee, "be paid over to and become part of my residuary estate under my Last Will and Testament." This would appear to be a clear indication that he considered the residuary clause to be effective, notwithstanding the codicil.
To construe the codicil as revoking and cancelling the residuary bequests of the four relatives would patently be contrary to the rule that a codicil modifies a will only to the extent necessary to give effect to the changes made by it. Gerber v. Gulick, 137 N.J. Eq. 403, 406 (Ch. 1946); McGill v. Trust Company of New Jersey, 94 N.J. Eq. 657, 662 (Ch. 1923), modified on other grounds 96 N.J. Eq. 331 (E. & A. 1924); Thomas v. Scheible, supra.
Further, to construe the codicil as having the effect of cancelling the residuary bequests in question would require a departure from the cardinal canon of construction that in the absence of an expressed intention to the contrary a will is to be construed in a manner favorable to the natural and special objects of the testator's bounty. It will not be presumed that testator intended to discriminate between the natural objects of his bounty, and a construction effecting equality between the natural objects of his bounty will be favored. Byrne v. Byrne, 123 N.J. Eq. 6, 19 (Ch. 1938), affirmed 124 N.J. Eq. 273 (E. & A. 1938); Armstrong v. Hyde, 28 N.J. Super. 536, 541 (Ch. Div. 1953); Tourigian v. Tourigian, 29 N.J. Super. 94, 98 (Ch. Div. 1953). The court below specifically found, as do we, that the four beneficiaries were natural and special objects of testator's bounty and affection. It properly refused to depart from the rule requiring that a will be construed in a manner favorable to them in the absence of an express intention to the contrary. As the trial court said:
"* * * It is inconceivable that the testator, without expressly stating so, intended to make such drastic change in the testamentary plan as to eliminate those who heretofore were to receive 60% of *52 the residuary estate. Had that been his intention he would have said so."
Courts that have considered similar situations have reached the same result as the trial court. One of the leading cases on the question here involved was Colt v. Colt, 32 Conn. 422 (Sup. Ct. Err. 1865); Id., 33 Conn. 270 (Sup. Ct. Err. 1866); Id., 48 F. 385 (C.C. Conn. 1881), affirmed 111 U.S. 566, 4 S.Ct. 553, 28 L.Ed. 520 (1884). Testator there bequeathed to his brother James Colt "the use and improvement, during his life" of 500 shares of Colt's Patent Fire-Arms Company stock, and after James' death "to his issue lawfully begotten, as an absolute estate," on condition that James waived all claims he might have against testator. The will also gave 500 shares to the executors in trust for the lawfully begotten issue of James, the profits and dividends thereof to be applied to their education so far as might prove necessary, until the youngest survivor of the issue reached 21, at which time the stock and all accumulations thereof was to go to the issue in equal proportions as an absolute estate. The residuary clause provided that all the remaining Colt stock of which testator died seized was to be divided "amongst the several persons and parties to whom I have hereinbefore given legacies of stock, in the ratio and proportion in which said legacies of stock are hereinbefore given * * *."
A first codicil revoked the legacy of 500 shares of Colt stock given James for life with the remainder to his children, because of his unbrotherly conduct, and in lieu thereof testator bequeathed the shares to his testamentary trustees for founding a school for practical mechanics and engineers. A second codicil cancelled all provisions previously made for founding and carrying on the school. By this codicil testator gave each of James' children a legacy of $100 and cancelled and wholly revoked any other legacies or devises theretofore made for their use and benefit. He then proceeded to leave the 500 shares of Colt stock which in his original will he had bequeathed to his executors in trust *53 for the use of James' children, to hold in trust for all but the eldest son of his brother Christopher, in equal proportions.
The cases in 32 Conn. and 33 Conn. involved a suit brought by James Colt who claimed an interest, absolute or for life, in such proportion of the residuary stock as 500 shares bore to the whole amount of legacies thereof given in the will, and he sought a judgment fixing the rights of the beneficiaries in the residuary stock. On demurrer to the petition the Superior Court of Connecticut reserved certain questions for the advice of the Supreme Court of Errors, whose opinion appears in 32 Conn. 422. Applying the well-settled rules of testamentary construction, that court held that James Colt took a life estate in the residue of the stock and that Christopher's children took no share in the residue in respect of their codicillary legacy of 500 shares. The court said:
"The language of the revocation is plainly limited to the first five hundred shares. The words are, `the legacy of five hundred shares.' It would have been difficult to have used language more definite. The bequest of the residuary shares is in a different clause of the will, and has no reference to this clause except for the purpose of describing the legatees. If the last bequest had been in these words, `I also give to my brother James B. Colt ____ shares of the residue of said stock,' it would have been difficult to have raised a question as to a revocation. But a particular legatee can be specified as well by describing him as already a legatee as in any other way.
That the testator did not intend to revoke the residuary legacy may be inferred as well from what he did not say as from what he did. The specification of one item is always considered as implying the exclusion of others. If the testator had intended to cut off his brother entirely from any part of his property, it would have been much easier to have done it in express general terms, than to have made a specific revocation. He might have done, and naturally would have done, what in his second codicil he did do with reference to the children of James B. Colt. His language there is, `I hereby give and bequeath to each of the children of James B. Colt a legacy of one hundred dollars, and I hereby cancel and wholly revoke any and all other legacies or devises by me at any time heretofore made to or for the use of and benefit of said children or any of them.'

* * * * * * * *
*54 The second rule on which the respondents rely is, that where one devise or bequest is made as auxiliary to a previous one, if the former is revoked the other falls with it. * * * The rule is a correct one, but it has no application to these bequests. There is no connection between different shares of stock. There is no common use of them. They can be held with equal convenience separately or together. No case can be found where it has been held that a revocation of one devise operates as a revocation of another devise of merely the same kind of property. There would be no propriety in such a rule, and no reason for its adoption. * * *

* * * * * * * *
The strongest ground that can be taken for the respondents is, that there is virtually but one legacy to James B. Colt; that the testator had determined to divide all of his stock in Colt's Patent Fire Arms Company among certain persons in certain proportions, but not being certain how much he should leave at his death, he gave certain specified amounts to the legatees, in the proportion in which he intended to divide his whole stock, and then gave as a part of the same bequest the indefinite residue in the same proportions. It may be urged that he adopted this course in lieu of bequeathing the whole at once in proportion to certain numbers. There is some plausibility in this claim. If it is correct there would be a clear revocation of the whole bequest. But the most that can be said of it with any certainty is, that this may have been his intention.
The claim is not corroborated by anything else in the will or codicils, unless it may be the unfriendly feeling exhibited by the testator toward the legatee. On the other hand there are a number of particulars which would create, to say the least, a strong doubt of the correctness of this construction. The facts, that the bequests are in form separate; that the one in the case of James B. Colt is conditional, and the other not; that the revocation names specifically the first bequest; and the improbability of the testator's neglecting to make any bequest to a brother, are all calculated to favor a different construction.
Regarding the law then as settled, that a second legacy will never be presumed to be a dependent legacy, but that on the contrary every legacy, independent in its terms, will be presumed to be independent, and to make it otherwise a clear intention must appear on the face of the will, or will and codicil, it follows that the second legacy to James B. Colt must be regarded as an independent legacy, and consequently not affected by the revocation." (32 Conn., at pages 446-450)
After the demurrer had been overruled the case went to final hearing. Similar questions on the facts found were reserved for the Supreme Court of Errors whose opinion appears in 33 Conn. 270, and that court adhered to its former *55 view. The case in 48 F. 385 was brought on behalf of Christopher Colt's children after the death of James Colt, claiming they were entitled to the 500 shares of residuary stock in which James had had a life interest. In deciding against the children the court reviewed the decisions of the Connecticut court, as well as other authorities, and concurred in those decisions and the reasons on which they were rested. On appeal, the United States Supreme Court affirmed, 111 U.S. 566, 4 S.Ct. 553, 28 L.Ed. 520 (1884).
The Colt case was followed in Wetmore v. Parker, 52 N.Y. 450 (Ct. App. 1873). A like view was taken by the Supreme Judicial Court of Massachusetts in Pendergast v. Tibbetts, 164 Mass. 270, 41 N.E. 294 (1895). Cf. also Gillespie v. Gillespie, 96 N.J. Eq. 501 (Ch. 1924), affirmed o.b. 98 N.J. Eq. 413 (E. & A. 1925), distinguishing, as did the Wetmore court, the earlier case of Hayes' Ex'rs. v. Hayes, 21 N.J. Eq. 265 (Ch. 1871); and see Struble v. Van Blarcom, 130 N.J. Eq. 467 (Ch. 1941).

VII.
In arguing that the effect of the codicil was completely to eliminate the four legatees involved from any share in the residuary estate, appellants ask why Marguerite Connolly, a $2,500 legatee under the will and only a $100 legatee under the codicil, should receive approximately $8,000 (the actual figure is about $6,818) in the residue, so that in lieu of substantial disinheritance  claimed to be the "obvious effect" of the codicil  she would benefit "out of all proportion to the clear meaning of the language." They also ask why Alfred Mockler, who was expressly deprived of his $20,000 cash bequest under the will and given by codicil only $100 a month from a trust fund, should still receive over $50,000 in cash from the residuary estate. On the surface, the queries would appear to carry some persuasion, until one critically considers the plain language of the will and codicil, either standing alone or read in the light of settled canons of construction. Two obvious counter-queries immediately *56 suggest themselves. Can it be said that testator intended to cut off his sister Annie, who was the particular object of his bounty and devotion, with only $10,000, plus a one-fifth remainder in the $30,000 trust set up for his brother Alfred? Is it reasonable to believe that testator likewise meant to limit his nephew Frank Kennedy, to whom he had turned for advice in connection with his will and codicil and whom he had chosen as one of his executors, to a mere $10,000 bequeathed him under the codicil? One might ask, with equal pertinence, whether the testator, in the words of the trial court, intended to make so drastic a change in his testamentary plan as to eliminate the four persons who were clearly the special objects of his bounty and who theretofore were to receive 60% of his residuary estate. He did not say so and, under our reading of the language of the will and codicil and our application of the canons of testamentary construction, we cannot say he so intended.
The executors, as already noted, propose that Alfred Mockler's share in the residuary estate be determined on the basis of the $20,000 originally given him in the will, but that this share be placed in trust, Alfred paid $1,200 a year for life, and on his death the principal of the trust divided among those of decedent's five sisters who survived testator. To carry out this proposal would constitute an affirmative rewriting of the will to a substantial extent, contrary to all accepted rules of testamentary construction. Further, it would give decedent's sisters, other than Annie, a substantially greater interest in the residuary estate than is consistent with any indication of intent by testator, either from the language of the will and codicil or from a study of the surrounding circumstances.
Another approach suggested is that contained in the alternative proposition of defendants Alfred Mockler, Annie Mockler and Marguerite Connolly, that the legacies be read into the will as substitutionary legacies for the purpose of determining the several distributive interests in the residuary estate. In the first place, we perceive no substitutionary language in the codicil. An even more important objection *57 to this suggestion is the difficulty that would be encountered in making the calculations in such case, particularly Alfred's participation in the residuary estate. Would his share be determined on the basis of $30,000? Actually, in view of the power given the trustees to invade the trust principal so as to insure Alfred's receiving $1,200 a year, the numerator of the fraction which would determine the amount he would receive from the residuary estate would not be determinable until the end of his life. Or is the calculation of Alfred's interest in the residue to be on the basis of an actuarial calculation of the value of his annuity and an increase in the amount of the share of the sisters in the residue measured by their particular legacies plus the addition of the value of their remainder interests?
The only course not involving the taking of extreme liberties with the specifically expressed provisions of the will and codicil and the application of established canons of testamentary construction, is that taken by the trial court. It accords on the whole more closely with the probabilities as to what testator's intention was than any of the suggested alternatives, and is in agreement with the weight of authority in comparable situations, as evidenced by the Colt, Wetmore and Pendergast cases cited above.
We cannot help but observe that the questions posed by the conflicting contentions of the three groups of beneficiaries involved on this appeal would probably never have arisen had there been any consultation between the attorneys who drew the will and codicil and the testator.
In our view the trial court took the only course which would not result in either a manifest violation of testator's intention or a judicial rewriting of the will. The judgment is affirmed.
NOTES
[*] Under the executors' contention, a trust fund of $54,544 would be set up to pay Alfred Mockler $1,200 per year until his death, and upon his death the principal would be divided equally among Annie Mockler, Kathleen Telford, Louise Kennedy, Christina Harding and the estate of Belle Saul.