THE CHASE MANHATTAN BANK OF THE CITY OF NEW
  YORK, AS ONE OF THE TRUSTEES UNDER THE LAST
  WILL AND TESTAMENT OF FREDERICK T. GATES,
  DECEASED, *ET AL.*, PLAINTIFFS-RESPONDENTS, v.
  GRACE GATES MITCHELL, *ET AL.*, DEFENDANTS-AP-
  PELLANTS, AND GERALD HUNTINGTON HOOPER, *ET
  AL.*, DEFENDANTS-RESPONDENTS.

Argued February 3, 1969—Decided March 17, 1969.

Mr. *William R. Soons* argued the cause for defendant-appellant Percival T. Gates (*Mr. P. Charles DiLorenzo,* on the brief; *Messrs. Soons & Soons,* attorneys).

Mr. *Barry A. Osmun* argued the cause for plaintiffs-respondents Chase Manhattan Bank, N. A. and Leverett F. Hooper (*Mr. J. H. Lippincott, Jr.,* of counsel; *Messrs. Stryker, Tams & Dill,* attorneys).

Mr. *George R. Harris* argued the cause for defendants-respondents Gerald Huntington Hooper and Gail Hooper Gellman (*Messrs. Keer, Booth, Buermann & Bate,* attorneys).

Per Curiam. The testator died in 1929. By his will made in 1925 he provided for his widow for life, and for each of his children for their lives, with the *corpus* of each child's trust to go to that child's "descendants * * * *per stirpes.*" His daughter Lucia and her husband adopted two children, one in 1934 and the other in 1938, both less than two years of age at the time of adoption. Lucia died in 1967, and the question is whether her adopted children take or whether there is gift over to Lucia's brother, her two sisters, and children of three brothers who predeceased her. The trial court held for the adopted children. We certified the appeal before argument in the Appellate Division.

The judgment is correct. The case is controlled by *In re Coe's Estate,* 42 *N. J.* 485 (1964), and *In re Thompson's Will,* 53 *N. J.* 276 (1969). Here the word used is "descendants," but we see no difference in this connection between that word and "issue" (the will here also used "issue") or "children." "Descendants," no less than "issue" and "children," is mute with respect to the inclusion or exclusion of adopted children.

Nor are the surrounding circumstances revealing. We are asked to find an intent to exclude the adopted children

upon the basis of testimony of testator's cousin and a book the testator authored and published privately. As to the cousin, he never discussed adoption with the testator. His "opinion" was that the testator would not have wanted an adopted child to take, and this in part on the premise that he and the deceased thought alike. Curiously, when the witness was asked whether, if he had adopted grandchildren, he would exclude them from his beneficence, he was unable to say unconditionally that he would. We see no evidential value in that testimony.

As to the book, it is clear the testator was tremendously proud of his Pilgrim and Puritan stock with its English antecedents, and conscious of genealogical influences. But pride in blood stock is neutral as to adoption. Many men are proud of their heritage, national, ethnic, religious, or racial, and attribute signal qualities to that inheritance. There is no reason to impute to every such man the unnatural intent to disinherit children his daughter takes for her own.

We invited counsel to present whatever help the files of the draftsman, or the practice of his firm, might offer. We are told that nothing relevant has been uncovered. Counsel, however, refers us to excerpts from two books by New York authors, no doubt because the will was drawn by a law firm of that State. Both books say that such words as children, issue, or descendants will not usually include an adopted child. *Remsen, The Preparation and Content of Wills* (1907), *pp.* 96–98; *Davids, New York Law of Wills* (1924), *pp.* 1080–1081. As to this, we note that neither author anticipated *Matter of Park's Estate,* 15 *N. Y. 2d* 413, 260 *N. Y. S. 2d* 169, 207 *N. E. 2d* 859 (1965), and *Matter of Silberman's Will,* 23 *N. Y. 2d* 98, 295 *N. Y. S. 2d* 478, 242 *N. E. 2d* 736 (1968), wherein the New York Court of Appeals held that a presumption exists in favor of an adopted child whether the word heir, child, issue, or other generic term expressing the parent-child relationship is used. *Park* so held with respect to a will of a man who died in 1909.

We find of special interest that the cited book by Remsen, written in 1907, gave this instruction to the draftsman (*p.* 97):

"In the case of adopted children, the testator should express clearly his intentions to include or exclude without relying on any statutory words defining the rights or status of such children. * * *"

This sustains the conviction we expressed in *Coe, supra,* 42 *N. J.,* at 494, and *Thompson, supra* (53 *N. J.,* at 291), that no competent draftsman would deliberately select any of the words we have mentioned to execute his client's purpose to exclude an adopted child.

There being no evidence of the testator's actual intention, we should follow the policy of the adoption law enacted in 1877, almost 50 years before the will here involved was executed.

The judgment is accordingly affirmed.

JACOBS, J. (dissenting). In this field the judicial responsibility is well defined. It is to seek and carry out the testator's lawful purpose though it may currently appear to the court to have been utterly misguided. This testator was obsessed with his own blood line and he in all likelihood intended to confine his bounty strictly to those who followed in that line. That much appears most pointedly when the terms of his will are viewed in the light of his published book entitled *Our American Ancestry* and the testimony of Dr. Bowers who on numerous occasions discussed its subject with him.

The testator dedicated his book to his "sons and daughters and their descendants." In it he refers to "the strains of blood which converge in me and in your mother", to "all the American vehicles of my blood" and to the early settlers who "had little of value but their blood" and whose blood "with its inevitable share of human frailties was a richer legacy than titles, wealth or culture could have given." And throughout there were repeated references to the "blood of my father", to "our family blood", to the family indebted-

ness for "our blood", to the fact that "we, their proud descendants, know and care about their forebears" and to the "temperaments and traits of character" transmitted through the blood line.

Dr. Bowers testified that the testator was well educated and was very "authentic in his use of words". When he used the word "descendant" he "undoubtedly meant the same as the genealogy term 'issue' ", i. e., "the natural born children and none other". He meant "the biological, natural offspring of his children". According to Dr. Bowers there was little public or private discussion of adoptions in the testator's era (1853–1929) and there were then none in his family line. Adoption "would have been anathema" to the testator and he "would have been quite outraged by the statement that adopted children were equal to natural children in the genetical sense or in the genealogical sense." Dr. Bowers expressed the opinion that the testator's strong feeling with respect to his blood line would carry forward to the distribution of property and that he would "confine it to his blood children". Apparently to this particular testator along with many others of his generation, that would be the natural thing to do.

Although the will was drawn by a well known and highly competent law firm, there is no doubt that the testator had an extensive hand in its terminology. Words and phrases such as "descendants", "descendants per stirpes" and "descendants of mine" appear at least 40 times in a compact will. The word "issue", used interchangeably with "descendant", appears on four occasions. The words my "sons and daughters" and their "descendants" appear repeatedly but the words "children" and "grandchildren" do not appear at all. The crucial clause provides that upon the death of each surviving son or daughter, his or her share shall be transferred to that son's or daughter's "descendants in ratable shares, per stirpes". In the light of his education and interests, there is no reason to suspect that the testator was not fully aware of the common dictionary meaning of *"per*

*stirpes"* as well as "descendants". See *In re Pistor's Estate,* 53 *N. J. Super.* 139, 149 (*App. Div.* 1958), affirmed 30 *N. J.* 589 (1959): *" '[P]er stirpes,'* even when considered as referring solely to a mode of description, by its very meaning carries with it the idea of blood descendants." See also *Connecticut Bank and Trust Company, Trustee v. Hills, Conn.,* (December Term 1968): "The words 'descendant' or 'issue' in their ordinary and primary meaning connote lineal relationship by blood, and they will be so construed unless it clearly appears that they were used in a more extended sense."

Apart from the lay views of the testator himself, it may confidently be assumed that the legal views of the law firm were along the same vein. As was recently pointed out in my separate opinion in *In re Thompson's Will,* 53 *N. J.* 276 (1969), words such as "issue" and "descendant" used by a stranger to the adoption carried with them, when this will was written, the clear judicial presumption of natural off-spring to the exclusion of adopted children. It may fairly be inferred that the law firm was aware of this presumption. With hindsight it would have dealt with the subject with greater specificity although that thought does not advance us for it may equally be expressed in all construction cases affecting all types of instruments. The judicial responsibility remains to seek and carry out the testator's intent and here, as elsewhere in our law, the probabilities will suffice. See *Fidelity Union Trust Co. v. Robert,* 36 *N. J.* 561, 564 (1962). Since the record leaves little room to doubt that the Chancery Division's construction failed to fulfill this particular testator's views and wishes, which of course have no relation to mine, I vote to reverse.

HALL, J. (dissenting). I would reverse the judgment of the trial court on the thesis expressed in my dissenting opinion in *In re Thompson's Will,* 53 *N. J.* 276 (1969). It may also be noted that in the case at bar an eminent New Jersey law firm, long experienced in estate matters, advised New York counsel for the corporate trustee in

1934, after the first adoption by the testator's daughter, that the adopted child was not interested in the then contemplated accounting. The advice is a further indication that the law of this state was well understood to presumptively exclude adopted children from the scope of generic terms in the will of a stranger to the adoption.

*For affirmance*—Chief Justice WEINTRAUB and Justices FRANCIS, PROCTOR, SCHETTINO and HANEMAN—5.

*For reversal*—Justices JACOBS and HALL—2.