944 A.2d 33 (2006)
399 N.J. Super. 237
In the Matter of the TRUST CREATED BY AGREEMENT DATED DECEMBER 20, 1961, BY AND BETWEEN John Seward JOHNSON, Grantor, and Philip B. HOFFMAN, Gustav O. LIENHARD and Kenneth PERRY, Trustees (known as the John Seward Johnson 1961 Charitable Trust) (Four Cases).
Superior Court of New Jersey, Appellate Division.
Argued November 7, 2005.
Decided August 17, 2006.
*34 Joseph C. Mahon, Princeton, argued the cause for appellants/cross-respondents Eric B. Ryan and Hillary A Ryan in A-1487-03T1 (Cooper Levenson April Niedelman & Wagenheim, attorneys; Mr. Mahon and Gerard W. Quinn, Atlantic City, on the brief), and respondents Eric B. Ryan and Hillary A. Ryan in A-1820-03T1 (Mr. Mahon, on the brief).
Eugene M. Purcell, Bedminister, argued the cause for appellant Joseph R. Purcell, guardian ad litem for the minor great grandchildren of J. Seward Johnson in A-1785-03T1 (Purcell, Ries, Shannon, Mulcahy & O'Neill, attorneys; Mr. Eugene M. Purcell, Joseph R. Purcell, Susan M. Lawless and Mary Jean Barnes, on the brief).
Rosalind Westlake, North Brunswick, argued the cause for appellant William A.K. Ryan in A-1820-03T1 (Borrus, Goldin, Foley, Vignuolo, Hyman & Stahl, attorneys; Ms. Westlake, of counsel and on the brief).
Richard F. Collier, Princeton, argued the cause for appellants/cross-respondents Alice Ryan Bower and Roderick Newbold Ryan in A-2059-03T1 and respondents Alice Ryan and Roderick Newbold Ryan in A-1820-03T1 (Collier & Basil, attorneys, Mr. Collier, on the briefs).
Alan S. Naar, Woodbridge, argued the cause for respondent-cross appellant Martin Richards in A-1487-03T1, A-1785-03T1, A-1820-03T1 and A-2059-03T1 (Greenbaum, Rowe, Smith, Ravin, Davis & Himmel, attorneys; Mr. Naar, of counsel and on the briefs; Olivier Salvagno, on the briefs).
Howard W. Burns, Jr., New York City, argued the cause for cross-respondent Quentin Regis Ryan in A-1487-03T1, 1785-03T1, A-1820-03T1 and A-2059-03T1.
*35 Before Judges CUFF, PARRILLO and HOLSTON, JR.
PER CURIAM.
These appeals involve construction of a 1961 charitable trust settled by J. Seward Johnson (Johnson or the grantor). The principal issue is whether the grantor intended, by use of the term "spouse" in the trust instrument, to include a surviving or divorced spouse as an eligible beneficiary at termination of the charitable lead trust.
The issues in this case were first disposed of almost nine years ago by summary judgment after the trustees of the 1961 trust filed an accounting and asked for guidance in interpreting the 1961 trust instrument. The motion judge determined that the term "spouse" was clear and unambiguous and meant a person currently married to one of the grantor's then-living children and did not include a divorced spouse or a surviving widow or surviving widower. In an unreported opinion, this court reversed the motion judge's determination that the meaning of the term "spouse" was clear and unambiguous, finding that the term was ambiguous on its face and remanded the matter for further discovery and trial on the grantor's probable intent in using the word "spouse." In Re 1961 Trust, A-5762-96T1 (App.Div. Aug. 25, 1999) (slip op. at 20-29). This opinion also addressed a number of other issues.
On appeal to the Supreme Court, the Court reversed only that portion of this court's decision addressing the ability of third parties to challenge the paternity of one of the grantor's grandchildren by a particular marriage. In re Trust Created December 20, 1961, 166 N.J. 340, 765 A.2d 746, cert, denied sub nom Ryan v. Johnson, 534 U.S. 889, 122 S.Ct. 203, 151 L.Ed.2d 143 (2001). The Court did not address the issues implicated in this appeal.
Following a six-day bench trial, Judge Messina found that the grantor intended to include surviving spouses, but not surviving divorced spouses, as eligible beneficiaries. The trial judge admitted into evidence the testimony of the scrivener of the trust instrument. He also rejected a request to reform the 1961 Trust to exclude the so-called illegitimate daughter of one of the grantor's sons and denied counsel fees to the surviving spouse who benefited from the ruling.
Four separate appeals were filed. These appeals originally calendared back-to-back are consolidated on the court's motion for purposes of opinion only. At oral argument, we were informed that the issues regarding Jenia Johnson as a beneficiary and the conflict of interest raised by Eric B. Ryan and Hillary A. Ryan in A-1487-03 had been dismissed. Thus, the only issues that will be addressed in this opinion are the rulings that a surviving spouse is an eligible beneficiary, a divorced spouse is not an eligible beneficiary, and that the prevailing surviving spouse is not entitled to an award of counsel fees.
J. Seward Johnson was born in 1895 and was a son of the founder of Johnson & Johnson. During his life, Johnson established a number of trusts to which his several children were made beneficiaries. Four children were born to him and his first wife, Ruth: Mary Lea Johnson Ryan (1926), Elaine Johnson Wold (1927), J. Seward Johnson, Jr. (1930), and Diana Johnson Stokes (1932). Two children were born to him and his second wife, Esther: Jennifer Johnson Gregg (1941) and James Loring Johnson (1945). Among the trusts established by Johnson were four identical irrevocable trusts (the 1939 trusts) for the children of his first marriage. In 1944, Johnson created six substantially similar *36 trusts (the 1944 trusts), one for each of his children and primarily funded with shares of Johnson & Johnson stock. The 1944 trusts included power-of-appointment provisions that did not appear in the 1961 Trust at issue in this appeal.
Between 1948 and the creation of the 1961 Trust in December 1961, Johnson had eleven grandchildren, specifically, six by Mary Lea Johnson Ryan (Eric Ryan, 1951; Seward Ryan, 1952; Roderick Ryan, 1953; Hillary Ryan, 1954; Alice Ryan, 1956; and Quentin Ryan, 1958); two by Elaine Johnson Wold (Keith Wold, 1950; and Diana Wold, 1951); two by J. Seward, Jr. (Bruce Johnson,[1] 1948; and Jenny Johnson,[2] 1961), and one by Diana Johnson Stokes (Loran D.J. Stokes, 1960).
On December 20, 1961, Johnson created the trust at issue in this appeal, the 1961 Trust. The trustees were to pay income to charities until the earlier of January 10, 1997, or the death of the last of certain named measuring lives, expressly, his first four children and all of his then-born eleven grandchildren. After January 10, 1997, the trust provided as follows with respect to income:
[2.](b) [I]f this Trust shall still be in existence on January 10, 1997, . . . and for so long as this Trust shall be in existence, to accumulate the net income and add it at the end of each calendar year to the Trust Property provided, however, that the Trustees may use for or distribute and pay to and among the Grantor's four children, MARY LEA JOHNSON RYAN, ELAINE JOHNSON WOLD, JOHN SEWARD JOHNSON, JR., and DIANA MELVILLE JOHNSON STOKES, their spouses, and their issue, or any one or more of them, so much of the net income and in such shares as the Trustees in their absolute and uncontrolled discretion may deem to be for his or her best interests.
Also after that date the trustees were authorized to make corpus distributions as follows:
[3.](b.) After January 10, 1997, and for so long as this Trust shall be in existence, from time to time, and whenever in the absolute and uncontrolled discretion of the Trustees they deem it to be for his or her interests, to use for or distribute and pay over to and among the Grantor's four children, MARY LEA JOHNSON RYAN, ELAINE JOHNSON WOLD, JOHN SEWARD JOHNSON, JR., and DIANA MELVILLE JOHNSON STOKES, their spouses, and their issue, or any one or more of them, in such shares as the Trustees may determine, to be his or hers absolutely, outright, and forever, any or all of the Trust Property.
At termination, the trustees were directed
[3.(c.)](i) to divide the Trust Property then remaining into as many equal shares as there shall be children of the Grantor's four children (MARY LEA JOHNSON RYAN, ELAINE JOHNSON WOLD, JOHN SEWARD JOHNSON, JR., and DIANA MELVILLE JOHNSON STOKES) then living, or children of the Grantor's four children who died leaving issue who are then living, and to transfer and pay over, absolutely, outright, and forever, one of each such equal shares to each child then living of the Grantor's four children and one of each such equal shares to the *37 issue, per stirpes, then living of each deceased child of the Grantor's four children, or failing all such persons, then
(ii) to divide, transfer, and pay over, absolutely, outright, and forever, the Trust Property to those persons, other than the Grantor, who, under the laws of New Jersey then in force, would have been entitled to inherit from the children of the Grantor's four children, MARY LEA JOHNSON RYAN, ELAINE JOHNSON WOLD, JOHN SEWARD JOHNSON, Jr. and DIANA MELVILLE JOHNSON STOKES, (had such children of the Grantor's four children at that time died intestate domiciled in New Jersey) personal property located in New Jersey of which he or she died possessed and in the same proportions as they would have been so entitled, or failing such persons, then
. . . [to distribute the Trust Property to educational, religious or charitable organizations meeting certain IRS requirements and as selected by the trustees in their discretion.]
Thus, the 1961 Trust provided for discretionary distributions to "spouse[s]" after 1997, of income and corpus, until the trust's termination, at which point the children or issue of the oldest four Johnson children named in the instrument were to be the primary beneficiaries. Notably, designation as a beneficiary did not guarantee a distribution from the 1961 Trust, except on termination and then only to the beneficiaries designated to receive distributions on termination. The trustees were always to be two senior Johnson & Johnson executives. The third trustee was originally Kenneth Perry, the former General Counsel of Johnson & Johnson. He was succeeded in 1964 by James Hill, who remained a trustee at the time of trial.
The 1961 Trust does not define "spouse." It does define "issue," and it also provides a limitation on the number of adopted issue.
As with the grantor's prior trusts, the 1961 Trust was funded with Johnson & Johnson stock. At the time of the creation of the 1961 Trust, the grantor's first four children were alive, married and none had been divorced. As of December 1961, none of the grantor's married grandchildren were yet divorced. Thereafter, additional grandchildren of the grantor were born or adopted (two to J. Seward, Jr., three to Diana Johnson Stokes, two to Jennifer Johnson Gregg, and seven to James Loring Johnson).
Much of the trial following the remand focused on the grantor's lawyer's knowledge and understanding of Johnson's intent under the 1961 Trust. Kenneth Perry, the former General Counsel of Johnson & Johnson and the architect of the Johnson trust and estate plan, died in 1964. James Hill was hired by Perry as an attorney in 1949, and he eventually succeeded Perry in managing the Johnson estate and other personal family matters. Initially, Hill worked as Perry's subordinate or associate and under Perry's supervision drafted Johnson family wills and documents in addition to his other duties.
Johnson started to come to Hill's office on a regular basis and Hill sometimes went to meet Johnson at his house or farms. Occasionally, Hill traveled with Johnson. Hill felt that the two men came to know each other very well, and that Johnson approved of his work.
By the early 1950s, Perry assumed special counsel status and moved to Arizona. Hill became the person in the Law Department with the day-to-day responsibility of addressing Johnson's questions. By this time, Hill was also serving as trustee of a number of trusts Johnson had established for family members. Hill also worked with Johnson on a host of family and charitable *38 projects. Nevertheless, Hill continued to solicit Perry's approval of some of the legal work he performed on Johnson family matters.
Beginning in 1959 or 1960, based on what Hill had learned from another attorney in New York whom he held in high regard, Hill formed the idea to create what would become the 1961 Trust as part of an overall process of qualifying Johnson for the so-called unlimited charitable contribution deduction from income tax. Hill drafted the 1961 Trust document, but he Sought Perry's review and advice throughout the finalization of the instrument because Perry designed Johnson's overall estate plan. Hill incorporated any concerns expressed by Perry and then presented the draft to Johnson, telling him of Perry's approval and discussing with Johnson whatever questions Johnson had. Hill observed Johnson read the documents. Johnson asked questions about the meaning of particular paragraphs during the extended drafting process. Johnson also proposed some changes, although Hill could not recall any specific ones.
In that way, therefore, Hill tried to "incorporate Mr. Johnson's intent." He recalled that the two men disagreed at times over a provision, and it would be changed to reflect Johnson's will, unless the change was not allowed by law. Alterations were made in the trust instrument almost up to the date of execution. It was finally executed by Johnson on December 20, 1961.
Hill provided a succinct overview of the 1961 Trust in the following testimony: "Well, during the general term, it was to devote all of its income to charity, and after the charitable term, the trustees would decide which members of the family [within the identified class] were to get how much and when." He further explained that Johnson excluded the two children by his second wife because Johnson was cognizant which children would inherit additional monies, and overall "he wanted the children generally to be treated equally." Regarding distributions prior to termination, Hill understood that Johnson wanted his trustees to have "uncontrolled discretion" as to whether any beneficiary received them, an intent Hill understood as complementing the grantor's general concern that the trustees be able to address what Johnson often referred to as the "vicissitudes of life," or the "unanticipated, unfor[e]seen problems that would arise in anybody's life." The grantor "wanted absolute maximum discretion" given to the trustees so that "they would never be in trouble or sued or bothered by anyas he put itlawyers."
With respect to the class of eligible beneficiaries, Hill had many discussions with Johnson but particularly recalled how Johnson was "insistent that the last two beneficiaries [the children of his son J. Seward Johnson, Jr.] be identified" by name. He added that "I think he thought it would help the family."
Hill was also sure he had conversations with Johnson about "spouses of his children" as a class of beneficiaries, but he could not recall them specifically. Nonetheless, Johnson did not want to "distinguish among the different classes of beneficiaries . . . [,] [h]is children, spouses and grandchildren," saying instead "that that's up to the trustees to distribute within that broad category as they saw best." Thus, Hill believed that the grantor's intent was that surviving spouses of any of the named children should be considered beneficiaries under the trust Although the grantor never expressed as much, and Hill "never discussed the subject directly with him," Hill added that "certainly, it was my understanding that he wanted to include surviving spouses."
*39 Hill garnered that impression from Ma long association with Johnson. Over time, the two men discussed family matters, as well as "world issues," and Hill believed that they shared the same views about family in particular. He referred to Johnson as a "family man." Johnson had what Hill agreed was a "broad definition" of family, a view Hill likened to that held by "most laymen," the bounds of which included "parents, children, spouses, nephews, nieces, grandparents, brothers, siblings." In fact, according to Hill, Johnson was "devoted" to his family, and seemed to be interested in the spouses of his children as well as in his children themselves, though he was closer to some than others. Thus, Hill identified Johnson's overall goals in estate planning as providing for family and charities, noting that as time went by Johnson became more interested in charitable giving and particularly in the prospect of setting up a foundation.
In addition to general conversations, Hill also recalled two particular subjects of conversations. One concerned a widow in Trenton whose infant son was the beneficiary of a considerable amount of money. The widow, however, had very little money because no provision had been made for her as the spouse or the surviving spouse. Hill recalled that the situation was terrible. Hill related that he "got the impression from [Johnson] that if somebody somebody died and left a spouse that he would that [sic] spouse to be taken care of, either under the instrument or what have you." The second instance concerned Johnson's knowledge of the gift tax implications of gifts from a beneficiary to a spouse. Hill related that Johnson "was knowledgeable about tax law, and he knew that a beneficiary of his could not give to his or her spouse without worrying about gift tax, and he said how we can avoid that, and I said we'll permit transfers directly from the trust to the spouses." Hill noted, however, that "I don't think he distinguished between surviving spouses arid spouses at that time." Especially with respect to the tax issues and Johnson's concerns over limitations of gifts to a spouse, the grantor asked Hill whether he could "avoid that in these documents, and I said yes, [and] I meant the trustees [would have the power] to distribute directly to a spouse."
As for divorced spouses generally; Hill testified that they were no longer considered a member of the family once there was a divorce. As Hill stated, "they were out of the family." He elaborated fey reference to the personal history of Johnson and his brother, both of whom had been divorced. He stated:
Well from his and brother's record of having been divorced a couple times and those spouses were no part of the family, and he never discussed specifically with me a divorced child that I recall, but I think he felt that way. Once you're divorced, you're out of the family.
Nonetheless, during his testimony, Hill at times equivocated on the specifics of any discussion with Johnson of the word "spouse," though he never represented he could recall an exact conversation of the subject. For example, in answer to the question "did you have any discussions with Mr. Johnson about spouses of his children?" Hill replied, "I'm sure we did." Then, when asked further if they talked about spouses of his children "[a]s a class of beneficiaries," he answered "I'm sure we did. I don't recall them." Or, when asked if Johnson ever expressed that he wanted "surviving spouses" to be eligible to "receive distributions," Hill answered plainly: "[H]e never said that, and I never discussed the subject directly with him, but certainly, it was my understanding *40 that he wanted to include surviving spouses."
Moreover, for Hill's part as scrivener "I felt quite strongly that surviving spouses were part of the word `spouse.' It was a redundancy" as far as he was concerned and Hill believed that "if it hadn't been [the grantor's] understanding, I think he would have communicated that to me." In any event Johnson never told Hill to exclude surviving spouses from the beneficiary class.
Over objection, Hill also was permitted to give not just his impressions, but also his opinions on Johnson's intent regarding surviving spouses and divorced spouses as beneficiaries under the 1961 Trust. He reiterated that Johnson intended the surviving spouses be included while divorced spouses were not to be included.
Johnson died in 1983. Mary Lea Johnson divorced William Ryan in 1972. They had six children. In 1973 or 1974, she met Martin Richards and they married in 1978. She had no other children and remained married to Richards until her death in 1990.
According to Richards, he and Johnson had a personal relationship. He remarked that Johnson was not an "outgoing man," but he "was as close [as] one could possibly get with [Johnson]." He recounted that Johnson taught him to fish and asked Richards to escort his third wife through Europe. Richards was at Johnson's side in the days leading to his death and on the day of his death.
Richards acknowledged, however, that his relationship with Mary Lea Johnson Ryan's children was not harmonious even before her death. He described some of the acrimony that existed including litigation against their mother before her death in anticipation of estate issues. Richards inherited $42,000,000 from his wife, which he claimed "he never saw," although he conceded that he did create three charitable medical transplant trusts in her memory after her death.
According to Hill, in the course of administering the 1961 Trust, he had believed that Richards was a proper eligible beneficiary, but the other trustees disagreed with him. Ultimately, when the complaint in this case was filed, Hill acquiesced with their Opinion, but he still believed that his opinion was correct.
Eric Ryan, one of Mary Lea's children, testified that certain incidents over the years led him to believe that Hill misapprehended the intended beneficiaries of the 1961 Trust. Ryan believed that the 1961 Trust was intended to primarily benefit the grandchildren's generation and beyond rather than the oldest four children. Ryan also acknowledged that he had disagreed with the trustees' disposition of a funding request he had presented to them. He emphasized, however, that they funded the proposal after further research on his grandfather's philanthropic history. These interactions caused him to doubt Hill's ability to accurately reflect his grandfather's intent.
Following trial and the submission of proposed findings of fact, Judge Messina issued an oral opinion on July 14, 2003. In that opinion, he announced that he found Hill's testimony "reliable, trustworthy and very credible." Judge Messina proceeded to find that "Richards is a member of the class of beneficiaries eligible under the 1961 Trust, and I find that Mr. Ryan is not." The judge then explained the reasons for his assessment of Hill as a witness; Judge Messina stated:
I believe he had in my view impressive, professional credentials. He was a trusted member of the Law Department at Johnson and Johnson from 1949 to 1966. He did substantial personal work for *41 members of the Johnson family. Hill knew Seward Johnson very well and had a close personal as well as professional relationship with him. In 1961 Hill was deeply involved with Johnson's estate planning and Hill himself was experienced in trust and estate and also the tax laws relating thereto. Hill was in a unique position to understand and to know Mr. Johnson's probable intent. Johnson's goals in estate planning were to provide for his family, to support charity and to minimize taxes. He was devoted to his family and this included spouses of his children who he considered to be within the family, at least unless divorced when he considered them to be out of the family.
Judge Messina then found that Johnson took an active role in the formulation of the 1961 Trust. He made the following findings of fact:
With regard to the preparation of the 1961 trust Johnson played an active role, he proposed and requested changes in the drafts. Hill and Johnson, were very careful and Johnson would only sign if he chose to do so. Hill and Johnson worked very closely with each other with regard to the drafting of the 1961 trust document. The relationship between Johnson and Hill was such that Johnson wanted Hill to be a trustee. It was very important to Mr. Johnson that the trustees have utmost discretion with regard to the administration of the trust.
Judge Messina proceeded to then find that Johnson intended to designate a broad class of beneficiaries. He found as follows:
Mr. Johnson intended a broad class of possible beneficiaries and he wanted his trustees in whom he had great trust and confidence to take into account the vicissitudes of life in allocating funds among the eligible members of the beneficiary class. Johnson and Hill did speak about spouses. Hill thought it was Johnson's objective to include surviving spouses, that the word spouses included surviving spouses and that the term surviving spouse was a redundancy. It is also noteworthy that if the word spouse had not been used and surviving spouse had been used that that would remove the spouses of living children as eligible beneficiaries and that certainly was not Johnson's intent.
The judge also expressly found that Johnson would have informed Hill, if he did not want surviving spouses included as beneficiaries. Moreover, the judge noted that Johnson had provided for surviving spouses in other' trusts he had created, including the 1939 Trusts and the 1944 Trusts. Johnson also provided for his surviving spouse in his will.
In addition to the findings of fact rendered in his oral opinion, Judge Messina informed the parties that he adopted the proposed findings of fact submitted by Richards' attorney, except the portion that addressed judicial estoppel because he did not conclude as a matter of fact or law that the circumstances warranted invocation of the rule. The judge then applied these facts to the governing law. He said:
The Court in this case was charged with determining the probable intent of Mr. Johnson with regard to the wordword spouse in the 1961 trust. In doing this the Court looked at extrinsic evidence, the document itself and the language therein, and impulses common to human nature. The goal was to ascertain the grantor's intent and not be thwarted by stressing the literal meaning of word. The Court should put itself in the position of the grantor insofar as possible to attempt to accomplish what the grantor would have done had he envisioned the present inquiry and that's what I tried *42 to do in reaching the determination which I have reached here.
The judge noted that this court had found that the term was ambiguous on its face and that he was able to resort to a broad range of evidence to determine the probable intent of the grantor. The judge related that Hill testified based on personal knowledge not only of the grantor but also of the preparation of the trust instrument because he was the scrivener. Hill's testimony and the other estate planning measures used by Johnson over the years revealed that he wanted to provide for his family and that he had a broad sense of family because he included as beneficiaries the spouses of his children. Moreover, in his 1939, 1944 and 1961 Trusts, he provided for surviving spouses. On the other hand, Johnson's broad sense of family did not include divorced spouses. He had never made provision for divorced spouses. As to human impulses, the judge stated:
With regard to human impulses, Johnson consistently included surviving spouses within his broad concept of family and as possible beneficiaries. There is nothing inconsistent with Johnson's actions generally and in other estate planning instruments with regard to human impulses. Human experience teaches us that a husband does not lose his status as a spouse merely because his wife passes away.
On the other hand, common human impulses can be utilized to exclude divorced spouses.
Judge Messina held that Ryan's argument that the term "spouse" in the 1961 Trust was determined at the time of the execution of the trust instrument was unpersuasive. He noted that the children were referred to expressly by name, but the general term "spouse" and "issue" were used, thereby indicating that "membership in the class of beneficiaries was to be kept open and determined at the time of distribution." He asserted that the trust created a "class gift to a class of persons." Once again, he held that "it was clear from the testimony that Mr. Johnson considered divorced spouses out of the family."
Although Judge Messina ruled in favor of Richards, the surviving spouse, he denied his application for attorneys' fees. This court had previously denied Richards' application for attorneys' fees because he had not sought to protect the trust. In re 1961 Trust, supra, slip op. at 72-73. Judge Messina reasoned that Richards was furthering his own interests; therefore, he would not allow trust funds to bear the cost of his litigation. The judge also denied Richards' motion for reconsideration. Although the judge acknowledged Richards' claim that he was furthering the best interests of the trust, as well as the rights of other potential beneficiaries, he repeated that ultimately Richards was pursuing his own personal interests.
Although stated in different ways by the several appellants, the issues before this court on appeal can generally be characterized as follows. First, the court erred in construing the term "spouses" to include surviving spouses; second, the court erred by construing the word "spouses" to exclude divorced spouses; third, the court erred by receiving testimony from Hill and Richards on the question of the grantor's intent; fourth, the trial judge erred in allowing Hill to express an opinion on the issue of the meaning of the term "spouses"; fifth, the findings of fact are not supported by credible evidence in the record; and sixth, the trial judge erred in denying attorneys' fees to Richards.

I
We start by recognizing the limited scope of review of an appellate tribunal of *43 findings of fact made by a judge sitting without a jury. A trial judge's findings are binding on appeal as long as those findings are supported by adequate, substantial credible evidence. Cesare v. Cesare, 154 N.J. 394, 411-12, 713 A.2d 390 (1998) (citing Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484, 323 A.2d 495 (1974)). Such deference is particularly "appropriate when the evidence is largely testimonial and involves questions of credibility." In re J.W.D., 149 N.J. 108, 117, 693 A.2d 92 (1997). This standard of review does not absolve this court from conducting a painstaking review of the record. We may not, however, substitute our view of the evidence if we determine that the trial judge's findings are supported by the evidence.
Appellants contend that the trial judge's adoption of the findings of fact submitted on behalf of Richards prevents this court from conducting a careful review of the record. We disagree.
Rule 1:7-4(a) requires a judge to issue a decision either orally or in writing which "find[s] the facts and state[s] its conclusions of law thereon in all actions tried without a jury. . . ." How that is accomplished is vested in the sound discretion of the trial judge. Homann v. Torchinsky, 296 N.J.Super. 326, 340, 686 A.2d 1226 (App.Div.), certif. denied, 149 N.J. 141, 693 A.2d 110 (1997). Thus, a judge may grant or deny a new trial motion "for the reasons posited by the parties" rather than issue a statement of its grounds, Vartenissian v. Food Haulers, Inc., 193 N.J.Super. 603, 612, 475 A.2d 626 (App.Div.1984), as long as the judge makes such reliance explicit. Pressler, Current N.J. Court Rules, comment 1 on R. 1:7-4 (2006). The purpose of the rule is to make sure that the court makes its own determination of the matter. See Jarvis v. Jarvis, 832 A.2d 775, 779 (Me.2003) (expressing approval of "a trial court considering and utilizing, when appropriate" draft orders and findings, even without itself amending them, so long as on review it is clear they "reflect the application of judgment by the court and not simply one of the parties").
Here, Judge Messina made clear the extent of his agreement with and reliance on Richards' proposed findings of fact and conclusions of law. He also supplied a summary of his findings in his oral opinion. The oral opinion provides clear evidence that the trial judge carefully considered the evidentiary record and did not abdicate his decision-making responsibility. Moreover, his adoption of a substantial portion of one party's submission does not hamper our appellate function in any way.

II
We have carefully reviewed the record in its entirety and conclude that the trial judge's findings are supported by substantial credible evidence in the record. Judge Messina considered and accepted the testimony of Hill. As the drafter of the 1961 Trust, he was in a particularly favored, position to understand the purpose of the 1961 Trust and the intent of the grantor. Moreover, Hill was thoroughly versed in the entire estate plan. The 1961 Trust was not an isolated document. Rather, it was part of a complex estate plan.
Hill was also required to learn Johnson's goals. Over the years, he learned that Johnson wanted to care for his family, minimize taxes, and distribute funds to charities. As to his family, Hill learned of Johnson's interest in not only his children, but also their spouses. He also perceived by observation that Johnson's interest in spouses vanished on the occasion of a divorce.
*44 Hill's statement that he considered use of the term "surviving spouse" redundant and the trial judge's acceptance of this statement has evidential support. First, Hill recounted two instances in which he and Johnson spoke of situations in which no provision had been made for a surviving spouse. He also related that Johnson was troubled by the omission. It is not unreasonable to find that Johnson did not want that to occur in his family.
In addition, Hill's familiarity with the other trusts created by Johnson, in which express provision had been made for surviving spouses, supports Hill's statement that the use of the term was unnecessary. To him, prior practice had manifested the grantor's inclusiveness.
Although the reference to surviving spouses in the other trusts appears in a provision concerning the Johnson children's ability to exercise a power of appointment, the inclusion of surviving spouses in this limited fashion is no less instructive of Johnson's view of family. Indeed, it corroborates Hill's testimony of Johnson's inclusive concept of family. It indicates his willingness to allow his fortune to be shared with a person who became associated with the family through marriage. The caveat was that the person must continue to be married to one of his children at the time of the child's death. By the same token, the use of the term in the other trust instruments also corroborates Hill's testimony that a person was no longer included as family once divorced. Moreover, there is no evidence that Johnson ever instructed Hill to exclude surviving spouses.
Judge Messina also referenced the entire testamentary and estate plan. As noted, that plan revealed a grantor who favored not only his children and their issue, but also their spouses. Coupled with Hill's testimony about Johnson's interest in his family, including the spouses of his children, Judge Messina had substantial evidence from which he could find that Johnson did not intend to sever ties with the surviving spouse of a child. By contrast, the record also firmly supports the finding that Johnson had no interest in furthering the interests of a child's spouse once a child parted from a spouse through divorce.

III
Our responsibility as an appellate tribunal does not stop at this point. We must also determine whether the trial judge properly admitted the testimony of Hill and Richards and whether he properly applied the governing law to the facts as found.
In our prior opinion, we held that the term "spouses" was ambiguous and that the intent of the grantor could not be determined without resort to extrinsic evidence. In re 1961 Trust, slip op. at 20-28. We reversed the summary judgment order and remanded for trial. Id. at 29. The Supreme Court did not disturb that disposition. In re Trust Created December 20, 1961, supra, 166 N.J. at 340, 765 A.2d 746. We discern no basis to disturb that prior ruling. Similarly, the pre-trial motion for summary judgment was properly denied.
Recently, the Supreme Court addressed the rule of probable intent. In re Estate of Payne, 186 N.J. 324, 895 A.2d 428 (2006), provides a succinct summary of the purpose of the rule and the tools available to ascertain a testator's or grantor's probable intent. Justice Wallace wrote:
In interpreting a will, our aim is to ascertain the intent of the testator. `[W]hen we say we are determining the testator's intent, we mean his probable intent.' Fidelity Union Trust Co. v. Robert, 36 N.J. 561, 564, 178 A.2d 185 *45 (1962) (citation omitted). We continue to adhere to the view of the doctrine of probable intent expressed by Fidelity Union. In that case, the Court stated that in determining the testator's subjective intent, `courts will give primary emphasis to his dominant plan and purpose as they appear from the entirety of his will when read and considered in the light of the surrounding circumstances.' Id. at 564-65, 178 A.2d 185. The trial court should `ascribe to the testator 'those impulses which are common to human nature and . . . construe the will so as to effectuate those impulses.' Id. at 565, 178 A.2d 185 (citation omitted). More recently, this Court emphasized that `[c]ourts are enjoined to `strain' toward effectuating the testator's probable intent `to accomplish what he would have done had he envisioned the present inquiry.' In re Estate of Branigan, 129 N.J. 324, 332, 609 A.2d 431 (1992) (citation omitted).
The trial court is not `limited simply to searching out the probable meaning intended by the words and phrases in the will.' Engle v. Siegel, 74 N.J. 287, 291, 377 A.2d 892 (1977). Extrinsic evidence may `furnish [] information regarding the circumstances surrounding the testator [and] should be admitted to aid in ascertaining [the testator's] probable intent under the Will.' Wilson v. Flowers, 58 N.J. 250, 260, 277 A.2d 199 (1971). To be sure, the testator's own expressions of his or her intent are highly relevant. Id. at 262-63, 277 A.2d 199. Once the evidence establishes the probable intent of the testator; `the court may not refuse to effectuate that intent by indulging in a merely literal reading of the instrument.' Id. at 260, 277 A.2d 199.
[Id. at 335, 895 A.2d 428.]
In Payne, the Court considered a direct statement of the testator in a letter to the attorney drafting his will to ascertain the testator's probable intent that any property burdened by a debt should pass debt-free to his heirs. Id at 336-37, 895 A.2d 428.
In Fidelity Union, the Court held that the trial court should have admitted an affidavit of a grandson of the testator to ascertain the probable intent of the testator. Fidelity Union, supra, 36 N.J. at 564, 178 A.2d 185. The affidavit contained a statement that the testator disliked his sons-in-law and did not believe women should have large sums of money but should have an adequate income. Fidelity Union Trust Co. v. Robert, 67 N.J.Super. 564, 573, 171 A.2d 348 (App.Div.1961). In Flowers, the trial court received testimony from the scrivener of the document. He testified that he used the words "philanthropic" in place of the word "charitable" because he had an aversion to using the same word twice in a sentence. Flowers, supra, 58 N.J. at 259, 277 A.2d 199. With that testimony, the Court held that trust funds should be distributed only to charitable organizations. Id. at 264, 277 A.2d 199.
The testimony of Hill was properly admitted at trial. Indeed, as explained in Fidelity Union and its progeny, the exclusion of this testimony would have been error. Hill was the person entrusted with drafting the document. His statement that he considered the term "surviving spouse" redundant is no less relevant than the testimony of the scrivener in Flowers. He also was in a unique position to provide information about the circumstances surrounding the drafting and execution of the instrument.
Similarly, the testimony of Eric Ryan was also properly admitted. It served to cast doubt on Hill's apparent lack of bias *46 and Hill's interpretation of the grantor's intent. The testimony offered by Richards was of marginal relevance. He did not know Johnson's daughter at the time of the execution of the 1961 Trust; therefore, his testimony provided no information about the circumstances at the time of execution. He was able to provide some information, however, on the manner in which Johnson treated people once they became "family" by virtue of marriage.
Contrary to the assertion of appellants Eric and Hillary Ryan, we do not perceive that the trial judge viewed Hill as a lay expert on the interpretation of the 1961 Trust. The drafter of a will or trust has long been recognized as a primary source of information about the formulation of the contested document. It is the drafter who is usually in the best position to provide specific information about the testator's or grantor's concerns and desires. It is from the drafter that the court is often able to obtain evidence of direct statements of the grantor. See Engle, supra, 74 N.J. at 295-96, 377 A.2d 892 (relating conversations between the testators that occurred in the presence of the drafter). Here, Hill was undoubtedly well-educated and skilled in estate planning and the preparation of the requisite documents. It is clear, however, that Judge Messina's findings are founded on Hill's role as the drafter and confidant of the grantor rather than his position as a skilled estate planning professional.
Judge Messina utilized several accepted forms of extrinsic evidence to ascertain Johnson's probable intent. He carefully considered the testimony of Hill, the drafter. He examined the entire testamentary and estate plan. He considered common human impulses. All of these resources are considered reliable sources of information. In re Estate of Payne, supra, 186 N.J. at 335, 895 A.2d 428. Appellants rely on In re Estate of Bonardi, 376 N.J.Super. 508, 871 A.2d 103 (App.Div.2005). Although we focused entirely on the text of the trust instrument to reverse an order allowing termination of a trust, we did not hold that extrinsic evidence of intent was inadmissible, or, if admissible, of no probative value. Id. at 519-20, 871 A.2d 103. Rather, the text of the trust instrument left no doubt that the relief requested by the widow was wholly contrary to the probable intent of her deceased husband. Id. at 517, 871 A.2d 103.

IV
We are also unpersuaded by the argument that the trial judge improperly failed to consider the issue of when a spouse's interest vested. William Ryan, the divorced husband of Mary Lea Johnson Ryan, argues that his interest vested at the time the trust was created.
Initially, we note that Judge Messina ruled on this issue by implication. He found that the class of spouses and grandchildren was an open class, to be determined in January 1997, when beneficiaries could receive distributions from the trust. Of greater significance, the ruling comports with the general rule for identification of a class.
Article 3(b) of the 1961 Trust allows the distribution of net income after January 10, 1997, and until the termination of the trust. The persons who may receive a distribution of net income are designated by name or by class, such as spouses and issue. Here, we must determine whether the named beneficiaries' spouses are those at the time the agreement was executed or at the time the beneficiaries are eligible to receive a distribution.
Generally, when property is to be divided among members of a group, such as children, grandchildren or spouses, membership in the group is defined at the time *47 of distribution. Scott, The Law of Trusts § 127.4 (2001). In the case of a postponed gift, as exists in this case, membership in the group is ascertained at the end of the postponed period. Restatement of Property § 308, comment I (1940). In all instances, the language of the trust document is determinative.
In re Trust for the Benefit of Doris Duke, 305 N.J.Super. 408, 702 A.2d 1008 (Ch.Div.), aff'd, 305 N.J.Super. 407, 702 A.2d 1007 (App.Div.), certif. denied, 151 N.J. 73, 697 A.2d 546 (1997), reflects this general rule. In Duke, the issue was whether an adopted adult was a lineal descendent and, thus, a beneficiary of the trust Id. at 416, 702 A.2d 1008. The trial judge recognized the general rule that
A class gift is defined as a gift to a group of persons, which group is uncertain in number at the time the gift is made and which is to be ascertained at a future time, who are all to take in equal or other definite proportions. Rippel v. King, 126 N.J.Eq. 297, 8 A.2d 777 (Ch. 1939), aff'd, 128 N.J.Eq. 179, 15 A.2d 758 (E. & A.1940). . . . When a class gift is made, the testator is presumed to intend that those shall take it who constitute the class at the time the gift is to take effect, providing no contrary intent is shown. Damron v. Mast, 121 N.J.Eq. 489, 191 A. 467 (Ch.1937). A class must be determined as of the date of death of the [settlor], unless the indenture or will plainly indicates otherwise. [Commercial Trust Co. of N.J. v.] Adelung, 136 N.J.Eq. 37, 40 A.2d 214 [E. & A.1946]. Here the instrument clearly requires the determination to be made as of Miss Duke's death, since her lineal descendants cannot be ascertained until her death.
[Id. at 425, 702 A.2d 1008.]
In Duke, the trial judge held that the adult adoptee could not be considered a lineal descendent because the trust provided that the law in effect at the time the trust was created was to be applied in construing the document. Id. at 422, 702 A.2d 1008. The law in effect at the time did not recognize adult adoptions, thereby precluding the adoptee from qualification as a lineal descendent. Id. at 423, 702 A.2d 1008.
Here, unlike Duke, the 1961 Trust does not designate the law to be applied in the event construction of the instrument is required. On the other hand, as in Duke, the composition of the class of issue and spouses could only be determined at the time of distribution. Therefore, we reject William Ryan's contention that composition of the class of spouses was fixed as of the execution date of the 1961 Trust rather than the date at which the designated beneficiaries were eligible to receive distribution of net income.

V
Finally, we address Richard's contention that the trial judge should have granted his application for attorneys' fees. Richards argues that his complaint served to clarify the trust instrument and that the ruling may benefit others in the future. The trial judge held that Richards was "primarily attempting to further his own interest."
The court may award counsel fees in any case where such fees are permitted by statute. R. 4:42-9(a)(8). N.J.S.A 3B:14-23(1) authorizes trustees "to employ and compensate attorneys for services rendered to the estate or trust or to a fiduciary in the performance of his duties." Furthermore, under Rule 4:42-9(a)(2), a fiduciary may make counsel fee payments from a fee entrusted to him or her "subject to approval and allowance or to disallowance by the court upon settlement of the account." See also R. 4:42-9(a)(3) (awards in probate actions).
*48 With respect to funds in court, the justification for an allowance of counsel fees is found in part in an acknowledgment of a litigant's efforts to create sums to benefit others. Sunset Beach Amusement Corp. v. Belk, 33 N.J. 162, 169, 162 A.2d 834 (1960). If counsel fees are not provided for by statute, rule or contract, they are generally borne by the parties themselves. Satellite Gateway Commc'ns v. Musi Dining Car Co., 110 N.J. 280, 285, 540 A.2d 1267 (1988).
In certain circumstances, our courts will allow payment of counsel fees necessary to interpret a will or trust. Risley v. Kirkman, 56 N.J. 464, 471, 267 A.2d 50 (1970). In Risley, the challenger was the decedent's widow who was successful in her efforts to obtain a life estate in her late husband's property. Id. at 466, 267 A.2d 50. On appeal, the Court reversed the denial of fees to the widow noting that the sole beneficiary was the decedent's attorney and the attorney's partner had drawn the will. Id. at 467, 267 A.2d 50. Moreover, there was evidence that the decedent had given instructions to provide for his wife. Id. at 466, 267 A.2d 50. Holding that the widow was entitled to an actual trust, the Court held that she was entitled to counsel fees but only limited to that narrow aspect of her claim. Id. at 471-72, 267 A.2d 50.
This court also upheld a counsel fee award limited to the fees incurred to prosecute the removal of an administratrix of an estate. In re Estate of Silverman, 94 N.J.Super. 189, 194-95, 227 A.2d 519 (App.Div.1967). On the other hand, we disallowed fees for that portion of the matter prosecuted by plaintiff to advance his own interests. Ibid. See also Blut v. Katz, 36 N.J.Super. 185, 189, 115 A.2d 119 (App.Div.1955) (allowing counsel fees to be awarded when a party acts for the benefit of a number of persons). Thus, when a litigant seeks to vindicate his own interests, counsel fees ordinarily will not be awarded.
Here, the benefit Richards obtained for others must be evaluated. As a surviving spouse, Richards has succeeded only in being added to the class of beneficiaries who may receive a distribution. Due to the vast discretion bestowed on the trustees, Richards' success simply establishes eligibility; it does not assure a monetary award. It is simply too speculative whether his success may benefit similarly situated spouses. This uncertainty strongly suggests that the litigation is a personal success and, as such, does not warrant an award of counsel fees. Under these circumstances, we discern no legal error and certainly no abuse of the discretion reposed in the trial judge.
Affirmed.
PARRILLO, J.A.D., concurring in part, dissenting in part.
My quarrel is not with the applicability of the doctrine of presumed probable intent in this case, but rather with the majority's finding as to what the grantor's intent actually was. After correctly determining that, as a matter of probable intent, the term spouse as used in the 1961 Trust is not broad enough to include former (divorced) spouses, the majority nevertheless deems the term not too restrictive so as to exclude widows or widowers of Johnson's deceased children, a result in which I do not concur. While in the absence of clear and unambiguous direction, we should "strain towards effectuating the probable intent of the [grantor]," Fidelity Union Trust Co. v. Robert, 36 N.J. 561, 566, 178 A.2d 185 (1962), I find my colleagues' conclusion that the settlor had intended "surviving spouses" to be within the beneficiary class too far a stretch. Based chiefly on the draftsman's impressionistic *49 testimony, this determination of Johnson's probable intent is unsupported by substantial credible evidence in the record. Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484, 323 A.2d 495 (1974); Heritage Bank-North, N.A. v. Hunterdon Med. Ctr., 164 N.J.Super. 33, 37, 395 A.2d 552 (App.Div.1978).
The concept of presumed probable intent is not to be employed in an effort to sidestep a trust's provision. In re Estate of Munger, 63 N.J. 514, 521, 309 A.2d 205 (1973). Rather, it is to "be applied sparingly". In re Estate of Gabrellian, 372 N.J.Super. 432, 441, 859 A.2d 700 (App. Div.2004), certif. denied, 182 N.J. 430, 866 A.2d 986 (2005); see also In re Estate of Branigan, 129 N.J. 324, 332-33, 609 A.2d 431 (1992); In re Estate of Burke, 48 N.J. 50, 64-65, 222 A.2d 273 (1966). Our essential task is not to rewrite the governing instrument, but to ascertain the settlor's intention primarily within its four corners, In re Trust Under Agreement of Voorhees, 93 N.J.Super. 293, 298-99, 225 A.2d 710 (App.Div.1967), read, of course, "`in relation to the attendant circumstances.'" Kennedy v. Modeler, 38 N.J.Super. 35, 49, 118 A.2d 93 (App.Div.1955) (quoting In re Estate of Armour, 11 N.J. 257, [269], 94 A.2d 286 (1953)). In the limited instance where ambiguity exists, or an unforeseen contingency occurs, or a literal construction would be at apparent odds with the grantor's otherwise obvious intent, we resort to extrinsic evidence to determine "probable intent." Engle v. Siegel, 74 N.J. 287, 291, 298, 377 A.2d 892 (1977); Fidelity Union, supra, 36 N.J. at 568, 178 A.2d 185; In re Estate of Zahn, 305 N.J.Super. 260, 271, 702 A.2d 482 (App.Div.1997). On such occasions, the text of the entire trust instrument,[1] embodying the grantor's "dominant plan and purpose", is considered in conjunction with the surrounding circumstances, Fidelity Union, supra, 36 N.J. at 565, 178 A.2d 185, including "`impulses which are common to human nature'", ibid. (quoting Greene v. Schmurak, 39 N.J.Super. 392, 400, 121 A.2d 35 (App. Div.), certif. denied, 21 N.J. 469, 122 A.2d 528 (1956)), and, most importantly, the grantor's own expressions of intent. In re Estate of Payne, 186 N.J. 324, 335, 895 A.2d 428 (2006); Engle, supra, 74 N.J. at 291, 377 A.2d 892; Danelczyk v. Tynek, 260 N.J.Super. 426, 430, 616 A.2d 1311 (App.Div.1992). Such extrinsic evidence must, of course, be competent. N.J.R.E. 104(a); N.J.R.E. 401; N.J.R.E. 701.
On this score, the grantor's "direct statements of intention" are admissible to show his or her probable intent, Wilson v. Flowers, 58 N.J. 250, 262, 277 A.2d 199 (1971), as recollected by close friends, Danelczyk, supra, 260 N.J.Super. at 430, 616 A.2d 1311, or the scrivener, Wilson, supra, 58 N.J. at 261, 277 A.2d 199, or memorialized in the scrivener's files, ibid., or those of the grantor. Payne, supra, 186 N.J. at 336-37, 895 A.2d 428. Compare Engle, supra, 74 N.J. at 295-96, 377 A.2d 892 (explaining that testator's probable intent was to distribute his estate between two families and "benefit the class of persons constituting their respective families" because the will drafting attorney recollected testator requesting a will that would "`split it down the middle so they [the respective families] each get half . . .'" in the event of a common disaster) (alteration in original); Surina v. Gilbert, 54 N.J. 68, 70, 253 A.2d 465 (1969) (finding that testator intended beneficiaries to receive proportional shares after taxes were paid because when he was "advised that his plan *50 would not yield the maximum tax savings" testator "responded that there were more important values involved"); Danelczyk, supra, 260 N.J.Super. at 431, 616 A.2d 1311 (holding that a testator's probable intent was to devise a life estate in the second floor of an apartment, not the entire property not only because the drafting "attorney was adamant in his recollection that the testator had discussed only the apartment", but also because a close friend to the testator testified that testator "repeatedly indicated before his death that he had left defendant a `lifetime apartment.'"); with In re Thompson, 53 N.J. 276, 279-80, 250 A.2d 393 (1969) (finding that there was no inquiry as to the definition of "issue" under New Jersey law although after the couple adopted a child their New York draftsman consulted with New Jersey counsel the testator's file mention of issue was "only in terms of `children' and `grandchildren'"); Chase Manhattan Bank v. Mitchell, 53 N.J. 415, 417-19, 251 A.2d 128 (1969) (explaining there was no relevant information regarding testator's intent to treat an adopted child as a natural child because counsel uncovered "nothing relevant" to the adoption issue in the legal file although "testator was obsessed with his own blood line", published a book titled "Our American Ancestry", which references "`the strains of blood which converge in me and in your mother'", "`all the American vehicles of my blood'", "`blood of my father'", "`our family blood'", and there was testimony corroborating testator's distinction between adopted and natural children by someone "who on numerous occasions discussed [the book's] subject with him").
Actually Wilson "`is the first decision in Anglo-American law authorizing the admission of a testator's direct statements of intention as to his will.'" Engle, supra, 74 N.J. at 293, 377 A.2d 892 (quoting Clapp, Justice Nathan L. Jacobs  The Doctrine of Probable Intent, 28 Rutg. L.Rev., 251, 259 (1974)). Wilson is a will construction case in which the issue was whether the scrivener's use of the word "philanthropic" was intended to be the legal equivalent of "charitable." Wilson, supra, 58 N.J. at 263, 277 A.2d 199. In finding the terms interchangeable, the Court relied chiefly on the scrivener's testimony as to the testator's express and direct declarations that he wanted his entire residuary estate to go to charity, and that the scrivener used the word "philanthropic" as a synonym for "charitable." Ibid.
Courts, however, have been careful to distinguish between direct statements of a testator or grantor, which constitute competent evidence bearing on dispositional intent, and mere opinions or beliefs of third parties as to the grantor's or testator's probable intent, which are irrelevant and inadmissible. Thus, for example, in Chase Manhattan Bank, the will, which gave the corpus of each child's trust to that child's "descendants per stirpes", was otherwise silent as to whether adopted children of the testator's daughter were entitled to take the corpus of the daughter's trust after her death. In holding for the adopted children, the Court flatly rejected, as incompetent, the "opinion" testimony of the testator's cousin that he believed the testator would not have wanted an adopted child to take based on the premise that he and the testator thought alike. Chase Manhattan Bank, supra, 53 N.J. at 417, 251 A.2d 128. In marked contrast, in Engle, the testimony of the draftsman, recalling the testator's clear and direct declaration that in the event of a common disaster, he and his wife would like all of their property to be divided equally between their two families, was deemed not only competent, but dispositive of the testator's probable testamentary intent. *51 Engle, supra, 74 N.J. at 295-96; 377 A.2d 892.
The recent case of Payne distinguished between both kinds of proofs. The issue in Payne was whether the testator intended that his New Jersey home pass unencumbered to his devisee. His will specifically provided that the mortgage on his Maine vacation home would be satisfied from the estate, but omitted any mention of the New Jersey residence. In light of this omission, the Court resorted to extrinsic evidence, finding dispositive a letter from the testator to his attorney expressing the testator's clear desire to pay off the mortgages on all his real estate, and soundly rejecting both the draftsman's testimonial account of what he believed the testator meant and his interpretation of the otherwise clearly worded letter. Payne, supra, 186 N.J. at 338, 895 A.2d 428.
Here, in ruling that the term "spouse" includes widows and widowers who thereby fall within the eligible class of spouse beneficiaries of the 1961 trust entitled to receive distributions from the trustees in their absolute discretion, the trial judge relied heavily on the testimony of the primary witness, the trust draftsman, James Hill. But, as all concede, there were no particular expressions from Johnson to Hill about the meaning of the term "spouse" or the qualification of surviving spouses of his deceased children to take under the trust instrument. Hill himself acknowledged "never discuss[ing] the subject directly with [Johnson]", and could recall, like the draftsman in Payne, no conversations with Johnson in which the settlor dealt expressly with "surviving spouse" or directly stated his intentions as to them. Rather, Hill's testimony, insofar as it bore on the issue of Johnson's probable intent, was couched in such qualifying terms as "it was my understanding", "general impression," "thinking," "belief," or "feeling". Having ruled Hill competent, as draftsman, to answer questions about Johnson's intentions, the trial judge allowed Hill to testify as to what he believed Johnson meant in connection with drafting the 1961 trust and permitted the witness to opine as to Johnson's understanding in using words like "family" and "spouse" in the trust document. In other words, Hill expressed his opinion as to what he thought Johnson's intent was, rather than recount actual statements of intent directly from the settlor himself.
Such an attempt at proof does not suffice to establish a grantor's probable intent. Hill's belief is no more than a conclusion by supposition of the grantor's state of mind and, therefore, inadmissible as failing the requisite testimonial qualification of personal knowledge. See Priest v. Poleshuck, 15 N.J. 557, 562-63, 105 A.2d 541 (1954); State v. Colon, 246 N.J.Super. 608, 614, 588 A.2d 440 (App.Div.1991); In re Trust ex rel. Duke, 305 N.J.Super. 408, 420, 424, 702 A.2d 1008 (Ch.Div.1995), aff'd o.b., 305 N.J.Super. 407, 702 A.2d 1007 (App.Div.), certif. denied, 151 N.J. 73, 697 A.2d 546 (1997); see also Hester v. BIC Corp., 225 F.3d 178, 184-85 (2d Cir.2000). It really amounts to no more than mere impression, rather than competent proof, and falls far short of the requisite declaration or expression of a grantor's intent. Worse yet, it is an opinion questionably formed since seemingly, predicated largely on Johnson's perceived negative reaction to Hill's anecdotal account of a Mercer County widow left penniless while her minor child inherited a substantial amount of money. Having testified from no surer ground than his subjective thinking, Hill's testimony does not, in my view, support the conclusion that "surviving spouses" qualify as a beneficiary class under the trust. *52
Nor do the surrounding circumstances, to the extent relied upon by the trial court, support its finding. Nothing in the overall dispositional scheme, nor in tax minimization strategies, nor in "impulses common to human nature", suggests that Johnson intended to make surviving spouses eligible for the beneficiary class. In fact, just the opposite appears from this record. When Johnson wanted to make provision for surviving spouses, he specifically and expressly did so, as in the earlier 1939 and 1944 trusts, and, therefore, their omission from the 1961 trust is telling. Indeed, in the 1961 trust, no "spouse" of a child was even named as a measuring life or provided for in the event that all of the grantor's children, grandchildren and their issue had died.
Lacking any foundation either in the settlor's own words or surrounding circumstances, Hill's opinion testimony does not qualify as competent proof of Johnson's probable intent. Having failed to carry his burden of proving eligibility for the class of spouse beneficiaries of the 1961 trust, Payne, supra, 186 N.J. at 338, 895 A.2d 428, respondent Martin Richards, in my view, is not entitled to receive distributions thereunder and I would, therefore, reverse the trial court's finding to the contrary.
NOTES
[1] Bruce was adopted by J. Seward Johnson, Jr. He is the son of J. Seward Johnson, Jr.'s then wife Barbara.
[2] Jenny Johnson's paternity was initially at issue in the matrimonial proceeding between J. Seward Johnson, Jr. and Barbara and in the initial stages of this action.
[1] "[G]eneral principles governing the interpretation of a trust instrument are the same as those . . . governing] interpretation of . . . [a] will." Voorhees' Trust, supra, 93 N.J.Super. at 299, n. 1, 225 A.2d 710 (citation omitted).